## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 07 2019, 8:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.A. and F.S., Minor Children, <br><br> L.A., Mother, <br><br> *Appellant*, <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee*. | June 7, 2019 <br><br> Court of Appeals Case No. 18A-JT-3100 <br><br> Appeal from the Vanderburgh Superior Court <br><br> The Honorable Brett J. Niemeier, Judge <br><br> Trial Court Cause Nos. 82D04-1807-JT-1417 82D04-1807-JT-1418 |

**Brown, Judge.**

[1] L.A. ("Mother") appeals the involuntary termination of her parental rights with respect to her children, A.A. and F.S. (the "Children"). We affirm.

*Facts and Procedural History*

[2] Mother is the mother of A.A., born on March 23, 2005, and F.S., born on October 24, 2007. On February 28, 2017, the Department of Child Services ("DCS") filed petitions alleging that the Children were in need of services.[1] In March 2017, the Children were removed due to conditions including drug abuse, educational neglect, and problems with the home, shelter, and stability. On May 1, 2017, the court held a hearing at which Mother failed to appear and found the Children to be children in need of services ("CHINS").

[3] On July 25, 2018, DCS filed petitions to terminate the parent-child relationship. On October 18, 2018, the court held an evidentiary hearing. The court admitted the chronological case summary ("CCS") with respect to: CHINS actions related to A.A., F.S., and Mother's child, D.B., in which an order terminating jurisdiction was ultimately entered in August 2011; a CHINS action related to F.S. in which the final entry was a dismissal in June 2016; a CHINS case involving D.B. with a final entry of January 2018; a CHINS case involving A.A. with final entries in June 2016; a termination of parental rights action between Mother and F.S. which includes an entry dated May 8, 2017, stating: "Case Closed Effective: 12/16/2015"; and a termination of parental

_____

[1] The record does not contain a copy of the petitions.

rights action between Mother and A.A. which indicates that the case was closed in April 2017. DCS Exhibit E.

[4] Tracey Kelley, a therapist at Southwestern Behavioral Healthcare, testified that A.A. initially had some visitations with Mother, he was "rather negative about them," and he felt "[t]hat his Mom wasn't really interested in him." Transcript Volume II at 18-19. She testified A.A. said that a boyfriend had physically harmed him, he suffered emotional abuse, and he was exposed to instances of domestic violence between Mother and her boyfriend. On re-cross examination, she testified that A.A. had been in foster care three times.

[5] Mother testified that her first involvement with DCS occurred in 2010 due to her use of drugs and involved five children including A.A. and F.S. She testified that she had another involvement with DCS in 2014 involving A.A., F.S., and three other children based upon false allegations that her home had mold, that she was beating them with a baseball bat, and that her ex-boyfriend touched her daughter.

[6] She stated that she stayed at the Ozanam Shelter and was there for three months when the Children were removed. She stated that she was living with her mother in Illinois because her mother just had major surgery and that she would reside with her until she receives a letter "from the disability sayin' that I've been approved for disability." *Id.* at 46. Mother stated that she has ADHD, bipolar, COPD, emphysema, asthma, a pinched nerve, scoliosis, and

diabetes. She testified that she was not currently working and had two jobs in the past five years.

[7] She admitted that she did not complete substance abuse treatment. When asked if she failed to appear for any drug screens during the most recent case, she answered: "There were some I missed in the past. I don't have none recent." *Id.* at 38. She denied using illegal substances while the case was open and testified that she last used an illegal substance, marijuana, "[l]ast year." *Id.* at 39. On cross-examination, she admitted she did not finish the Counseling for Change program which she had been told she needed to complete to obtain the Children, that Mr. Austin was her case worker but she does not talk to him, that he did not respond to her calls or texts, and that her last drug screen occurred in March 2017. When asked when was the last time she used cocaine, she answered: "I know I've been clean for that three years now." *Id.* at 44. She testified that she last used marijuana in October 2016 and that she was staying clean. On redirect examination, Mother indicated that she stopped services because she was not receiving visits. She testified that if she does not receive disability, she could obtain a job that will support the Children.

[8] Family case manager Nathan Austin ("FCM Austin") testified that he officially took over as the ongoing case manager on September 26, 2017, there had been a history of issues regarding income or employment, and Mother admitted to the assessment worker that she had recently smoked marijuana and she tested positive for marijuana and cocaine. When asked if he recalled how many "absences or tardys" the Children had, he answered that he did not recall the

exact number but estimated that one had about eighteen and the other had about fifty-five. *Id.* at 58. He also stated that F.S. had all Fs and that A.A. was also failing his courses.

[9] Janet Bett, a home-based therapist, testified that she received the referral to work with Mother and the Children in December 2017, attempted to contact Mother, and after over a month she had the first face-to-face supervised therapeutic visit. When asked if she encountered any issues during her interactions with the family, she answered: "Yes, I did, a lot." *Id.* at 89. She stated that Mother seemed withdrawn all the time and that there were episodes where Mother would promise that she was on the way before canceling. She stated that there were cancellations, no calls, and no shows. Without objection, the court took judicial notice of the CASA report that had been filed.[2]

[10] On November 28, 2018, the court entered separate orders terminating Mother's parental rights to the Children. The court found that: Mother and the Children were homeless and living in a car prior to the filing of the CHINS petition; they were residing in a shelter at the time of the filing; Mother has a substantial history of involvements with DCS predating the initiation of the underlying CHINS cases; Mother's substance abuse has been an ongoing issue since December 2010; Mother failed to participate in or benefit from the services offered by DCS; and according to CASA Debby Gamache, Mother has been

---

[2] The record does not contain a copy of the CASA report.

evicted at least twice since the filing of the underlying CHINS causes and has not sustained consistent employment. It found: Mother had a significant history of substance abuse; she tested positive for THC, cocaine, and methamphetamine during the underlying CHINS causes and failed or refused to address her substance abuse; she admitted to the use of crack cocaine and marijuana during her intake appointment in December 2017; and she did not complete substance abuse treatment. It found that Mother failed to consistently attend visitation and that her behavior during visits demonstrated her lack of dedication to reunification.

[11] The court stated: "CASA, DCS, and the Court agree there is a reasonable probability that the reasons for the child's placement outside the home will not be remedied. As FCM Austin stated, the 'same concerns' that necessitated removal are 'still present.'" Appellant's Appendix Volume II at 33, 45. It agreed with DCS and CASA that continuation of the parent-child relationship posed a threat to the Children's well-being. The court stated that Mother "has done nothing to indicate that she truly wants to better her life or her child's life," "has refused to accept the State's assistance and has failed on her own," and "[h]er reasoning for not visiting her child, which was bogus, and her lack of visits, best sums up why she should no longer be the child's legal mother." *Id.* at 36. It found that "DCS and CASA believe that termination of parental rights and adoption are in the child's best interest" and concluded that adoption was in the Children's best interests. *Id.* at 36, 48. Discussion

The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*,

904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[14] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640. The involuntary

termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[15] Mother argues that DCS failed to prove by clear and convincing evidence that the conditions that resulted in the Children's removal would not be remedied, that the continuation of the parent-child relationship posed a threat to the well-being of the Children, and that termination was in the best interest of the Children. She asserts DCS provided no testimony that the home she shared with her mother was unfit or evidence to contradict her testimony that she was applying for disability for multiple medical conditions. She contends that the evidence demonstrated she no longer had a substance abuse issue and interacted appropriately with the Children. She also argues the evidence does not support the findings that she failed to provide stable housing and income, remain sober, interact with the Children, or benefit from or cooperate with services. DCS argues that the court's order is not clearly erroneous and that Mother's arguments amount to a request to reweigh the evidence.

[16] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there

is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

[17] The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id*. Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[18] To the extent Mother does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[19]     With respect to Mother's substance abuse, when asked about her compliance with obtaining a substance abuse evaluation and completing substance abuse treatment, FCM Austin stated:

> December 29th, '17 she did an assessment at Counseling for Change. From there she didn't follow up with any other appointments. It wasn't until March of 2018 where she attended a group. And that was only a one time occurrence. She then became noncompliant again. And then she either went into the office or called into the office and she rescheduled a reentry appointment for April, 2018, which she did not appear to.

Transcript Volume II at 60. He also testified that Mother had not completed substance abuse treatment. When asked to describe Mother's compliance with random drug screens, he answered:

> The most recent screens that I've checked is from March of 2017 to February, 2018, and there was ninety-nine scheduled screens. There was sixty-four no shows. There was approximately thirty-four, thirty-five that was taken. And out of those that were taken, only three were clean. And those are approximate numbers.

*Id.*

[20]     With respect to employment, FCM Austin testified that Mother obtained employment at one point through Ameriqual for a couple of weeks, then did yard work, then worked at a hotel, and then worked at McDonald's where she quit after seven days. Mother testified that she was not currently working and had filed for disability.

[21] FCM Austin testified that communication was very difficult with Mother and that he had four phone numbers for her which were all different from the number she gave his supervisor. When asked why he was never able to recommend placement of the Children with Mother, he answered: "Because there's no place to recommend her to be reunified with. For one, also the same concerns that got us involved is [sic] still present. Nothing has changed. And we don't foresee it happening." *Id.* at 67-68. He also stated that there was no intention of sustaining the level of sobriety that is needed, Mother was dependent on her own mother, ICPC denied the home of Mother's mother "because they said it's too small to have those children in that home," the drug abuse concerns are still present, there was still no satisfactory income, and DCS could not say that the Children would be placed in a stable environment with Mother.[3] *Id.* at 68.

[22] When asked if she felt Mother was engaged in the service she was providing, Bett, the home-based therapist, answered: "Not at all." *Id.* at 91. She testified that Mother's speech was slurred most of the time and that Mother slept during several visits and indicated that she had just taken some sleep medication.

---

[3] When asked to identify ICPC, FCM Austin answered: "I'm not familiar with the abbreviation, however, it's whenever there's a location for the children if there's another possible placement location outside of the State of Indiana. And being that [Mother] said that if she can't – during our meeting when we talked about permanency – she said, 'If I can't get my kids back I want them to go live with my Mom.' And based on her desire is the reason why DCS sent the ICPC to her Mother." Transcript Volume II at 68-69. The trial court's order states: "DCS previously completed background checks necessary for placing the child in another state, per the requirements of the Interstate Compact on the Placement of Children. Grandmother's home was denied for purposes of placement due to the home lacking sufficient space." Appellant's Appendix Volume II at 33-34 (footnote omitted).

When asked whether the goal of the family establishing communication and trust was achieved, she answered in part: "It was never achieved because [Mother] never attempted." *Id.* at 92. She testified that some of the cancellations occurred when Mother stated she did not have food or electricity. She also stated that she bought food herself and gave it to the Children.

[23]     Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied.

[24]     In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in

addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[25] When asked for his recommendation regarding the best interests of the Children, FCM Austin testified that his recommendation for the Children was to be adopted in their current placement. The court found that "DCS and CASA believe that termination of parental rights and adoption are in the child's best interest" and concluded that adoption was in the Children's best interests. Appellant's Appendix Volume II at 36.

[26] Based on the testimony, as well as the totality of the evidence in the record and set forth in the trial court's termination order, we conclude that the court's determination that termination is in the best interests of the Children is supported by clear and convincing evidence.

[27] Affirmed.

May, J., and Mathias, J., concur.